Samuel **POSTERNACK**

v.

The **AMERICAN INSURANCE COMPANY.**

Civ. A. No. 28141.

United States District Court
E. D. Pennsylvania.

June 5, 1964.

———◇———

Richardson Dilworth, Gary Charles Leedes, of Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., for plaintiff.

Thomas Raeburn White, Jr., Jan E. DuBois, of White & Williams, Philadelphia, Pa., for defendant.

FREEDMAN, Judge.

This suit was brought on two fire insurance policies covering plaintiff's retail furniture store and its contents, which were completely destroyed by fire on January 27, 1960. The jury returned a verdict for the defendant and plaintiff has moved for a new trial.

The case presented a number of unusual elements. Plaintiff claimed that Perrin and Tyson were his brokers and were looking after his insurance needs. They had previously written ten policies for the plaintiff with companies, other than defendant, for which they were agents, and had apparently collected from the plaintiff the premiums on these policies but had failed to report them or turn the proceeds over to the companies. On the day following the fire, after a meeting relating to the loss, Perrin and Tyson handed over to the plaintiff the two policies in suit and two others not here involved in exchange for the ten earlier policies which plaintiff delivered to them.[1]

The four policies were dated January 23, 1960, four days prior to the fire. They were printed in the familiar form prescribed by statute. They bear the facsimile signatures of the president and secretary of the company and contain a provision that they shall be valid only when countersigned by an authorized agent. Each policy was signed: "Jack J. Perrin, Broker for James N. Lutz, Agent". Curiously, although Perrin and Tyson were agents for a number of companies other than defendant, neither was a licensed broker (Transcript, pp. 169, 171), despite Perrin's signature as "broker" for Lutz.

Lutz, who admittedly was a general agent of the defendant, had delivered its blank policy forms to Tyson on January 23, 1960. Lutz claimed that he had given the blank forms to Tyson so that Tyson could fill in certain residences, unspecified at trial, as the insured properties and then return the policies to Lutz for approval by the company · and countersignature by Lutz. The plaintiff disputed Lutz's version of his purpose in turning over the blank forms to Tyson, claiming that Lutz knew that plaintiff's property was to be filled in · and that the delivery of the blank policy forms constituted an authorization to Perrin or Tyson to countersign the policies as Lutz's sub-agent.

The trial itself took a curious direction. Neither party called either Perrin or Tyson, the two admitted wrongdoers. Defendant did not call Lutz but it called the plaintiff as its own witness for a limited area of inquiry. The plaintiff, however, was not called as a witness in his own case, but plaintiff did call in rebuttal, again for a limited area of inquiry, Lutz.

Plaintiff presses two arguments. One is that I erred in refusing to submit to the jury the claim that the policies were ratified by Lutz. The other is that prejudicial conduct by defendant's counsel requires a new trial.

I

I refused plaintiff's request[2] that I charge the jury that if they found that plaintiff had delivered the policies to

---

1. There was a serious dispute, which I ultimately ruled out of the case, whether the four new policies were "replacement" insurance for the ten earlier policies, or additional insurance.

2. See plaintiff's Request for Charge No. 13, discussed at Transcript, pp. 293–94, and formally denied at p. 404, and plaintiff's Supplemental Request for Charge No. 2, discussed at Transcript, p. 296, and formally denied at p. 405.

Lutz in reliance on his representation that he would countersign them and thereby make them good, then the handing over of the policies by the plaintiff to Lutz constituted a ratification of the policies.

The facts on which the plaintiff's contention of ratification is based are these: Lutz received in the mail copies, called "dailies", of the first pages of the four new policies, including the two here in suit, on January 29, 1960, two days after the fire. Concerned at his inability to reach Perrin or Tyson, he sought them that day at their office. Finding them out he searched about on their desks for the policies, which he intended to destroy. (Transcript, p. 232). The telephone rang while he was there and he answered it. The caller, by coincidence, was the plaintiff. Each man identified himself to the other and Lutz asked Posternack if he had the policies. Lutz told Posternack that the policies were not valid because they did not bear his signature and he requested Posternack to bring them to him so that he could sign them.[3] Later that day the plaintiff, accompanied by his wife and son, brought the policies to Lutz's office. When Lutz requested to see the policies Posternack asked him what his intentions were. Having in mind that he intended to destroy them, Lutz said that he wanted to review the policies and "guessed" he would sign them. Thereupon, at Posternack's direction his son gave the policies to Lutz. Lutz put them together and tore them into a number of pieces. Posternack's son regained the torn policies. (Transcript, pp. 234–35).

■ It is clear that there was no act of ratification by Lutz of the signing of the policies by Perrin. Lutz made it clear that the policies were invalid without his signature and expressly limited what he would do to affixing his countersignature, as if Perrin had not signed them. At the most, therefore, what he said amounted only to a promise to perform an act in the future if the policies were delivered to him. There is nothing in the evidence from which it may be found that Lutz told the plaintiff that he affirmed Perrin's signature as his own; on the contrary, the evidence is undisputed that in order to obtain possession of the policies so as to destroy them Lutz told Posternack to bring them in because as they were, with Perrin's signature, they were invalid and if they were delivered to him he would affix his countersignature. It was a false representation, to be sure, but the only consequence to the plaintiff of its falsity was that when he recaptured the policies he handed over to Lutz they were in a mutilated form, still uncountersigned by Lutz. Thus ratification is without any support in the record.

It is not clear that a promise to ratify the policies in the future could be found from the evidence. However, even if Lutz's language were enough to constitute such a promise a number of difficulties remain. There was no change of position by Posternack in reliance on a promise of future ratification which could create an estoppel against the defendant to deny ratification. Moreover, there is a serious question whether an agent may orally ratify the signature of his alleged sub-agent when the policy expressly states that it is not valid until countersigned by the "duly authorized Agent of the Company". See 1 Couch, Insurance (2d ed.1960), § 8:16.

Putting these problems aside, however, there remains the question whether Lutz had authority from the defendant to ratify a fire insurance policy after the

3. Lutz's version appears in a statement he gave to a representative of the Insurance Commissioner (Transcript, pp. 224–25, 233), in which any promise that if the policies were brought to him he would sign them can, at best, only be inferred: "[T]hey weren't valid as my signature was not affixed and [I] requested that he bring them to me for same." Lutz's testimony at the trial lends support for plaintiff's claim that Lutz had told Posternack in their telephone conversation that he would countersign the policies if Posternack brought them in to him. (Transcript, pp. 222–28).

subject matter of the policy had been destroyed by fire. The burden of showing such authority, of course, was on the plaintiff.

One need not accept as an inflexible principle the dogma that once a loss has occurred an insurance company may not bind itself to liability on a policy. There may well be business or moral considerations which would justify a company, acting on the highest level of authority, in assuming liability in some such cases. If the board of directors of an insurance company authorized the assumption of liability in such a case it would be impossible to say that the act was unauthorized. An attack on such an acknowledgment of responsibility would amount ultimately to a claim of ultra vires, a defense of shrinking dimensions. But is a simple insurance agent, who is authorized to countersign policies in the regular course of business, apparently or impliedly authorized—for there is no evidence of express authority—to undertake to bind the company to such an unusual liability, a liability rather than a risk? It is the risk which is the inherent characteristic of the business of insurance and not the accrued liability.

■ The only evidence as to the nature of Lutz's authority is that he was an agent of the company in a small one-man office with no stenographer and no employees. In fact it was the very meagerness of Lutz's business that plaintiff urged should make the defendant responsible because it entrusted to such a poorly circumstanced agent its blank forms of policy when it should have realized that in his marginal enterprise there was likely to be unbusinesslike conduct, such as the delivery of blank policies to Tyson, which could then result in injury to innocent third parties like the plaintiff. I agreed with this view sufficiently to leave it to the jury whether in all the circumstances shown by the evidence there was implied authority from the company to Lutz to deliver the policies to Perrin and for Perrin to sign

them as Lutz's sub-agent, even though Perrin in his signature did not so label himself. But this is a very different matter from authority to assume liability on behalf of the company after the loss had occurred. Assumption of liability, as distinguished from assumption of risk, is an act so unusual and so out of the regular course of insurance business that something more than the mere authority to countersign policies must be shown before authority to do so may be found to exist.

■ The principle that general authority coextensive with the ordinary course of business does not include extraordinary authority outside the ordinary course of business is well expressed in one of the cases applying it to insurance:

"The very nature of an insurance contract is to indemnify the insurer against risk, and when there is no longer any risk, and the fact is known to both parties, the very purpose of the contract is destroyed, and it might be that such a contract would be against public policy. But, whether so or not, it seems to be a well-settled legal principle that an insurance agent, though he have authority to sign and deliver policies, cannot bind his principal in an attempt to assume a risk which has already become nonexistent. [citing texts and cases] * * *.

"[T]he ratification by the agent after knowledge of the fire is as much forbidden as his right to originally insure the property after such knowledge." [4]

■ Accordingly, even if the evidence would have justified a finding of a promise by Lutz after knowledge of the fire which could amount to a ratification, I hold that any such ratification would be ineffective as a matter of law because it was not shown that Lutz was authorized by the defendant to act on its behalf in so extraordinary a manner. This is in harmony with my charge that if the jury found that the policies were made up after the fire occurred, then, even if Perrin had authority to bind the defendant,

4. Hopkins v. Phoenix Fire Ins. Co., 200 Ky. 365, 254 S.W. 1041, at 1044 (1923).

the plaintiff nevertheless could not recover because there would have been no subject matter in existence at the time the contract was made. The principle underlying that instruction to the jury was not attacked by the plaintiff. It is equally applicable to a claim of ratification by Lutz after the fire had destroyed what was to be the subject matter of the contract.

## II

The statements by defendant's counsel of which the plaintiff complains dealt with two matters.

(1) In his opening to the jury defendant's counsel mentioned the amount of fire insurance which the plaintiff had in 1958, about a year and a half before the fire involved in the present suit. This was relevant to his claim, which I later rejected, that the four new policies, for which plaintiff surrendered the ten older policies, were "replacement" rather than additional insurance. However, he began his statement regarding the amount of insurance the plaintiff had carried in 1958 by referring to a fire at that time: "In 1958 he had a fire, and at that time he had—". (Transcript, p. 7). Plaintiff's counsel immediately interrupted with an objection, which was sustained. (Transcript, p. 8). Later, in the course of examining the plaintiff, whom he called as his witness, defendant's counsel asked whether plaintiff had had a fire in July of 1958. This was objected to as irrelevant, and on inquiry defendant's counsel responded: "Simply to show what the insurance was at the time." (Transcript, p. 127). Thereupon I commented and then admonished the jury as follows:

"THE COURT: Well, you can have that without having a fire. Most people have insurance without a fire. Otherwise there would be no insurance companies.

"Members of the jury, I will ask you to disregard the question, because I will sustain the objection to the question. Therefore, it is as if the question had not

been asked, so far as you are concerned, because the question is not evidence. Only the answer is." (Transcript, pp. 127–28).

There is no doubt that the prior fire was irrelevant and that mention of it was improper. It was twice brought to the jury's attention by defendant's counsel. But on both occasions the reference was immediately objected to and each time the objection was sustained. On neither occasion did the plaintiff request the Court to instruct the jury to ignore it. Nevertheless, after sustaining the objection to the question and indicating that the amount of insurance in existence at the earlier date could have been ascertained without reference to any prior fire, I went on to instruct the jury to disregard the question, pointing out that the question, which had not even been answered, was not evidence.

Thus the matter stood until the plaintiff was turned over to his own counsel for examination, whereupon plaintiff's counsel immediately asked him how long he had been in business. When this was objected to as beyond the scope of the direct examination, plaintiff's counsel went on to say that he wanted to show plaintiff's success in business in order to answer the allusions that had been made to a prior fire. (Transcript, pp. 150–51). Thus the fact of a prior fire was reopened by the plaintiff himself. Here again, after sustaining the objection, I said:

"And since I sustained the earlier objection by the plaintiff to the business of the fire, I don't think it is really relevant or material.

"MR. DILWORTH: Very well, sir.

"THE COURT: I will say to the jury, since we are now talking about a fire, which, so far as the jury is concerned, never occurred, it is most unfortunate that we are talking about it again, but you must disregard that." (Transcript, p. 152).

At no time thereafter did the plaintiff complain or request any further instruction to the jury. If it was a matter that

could have been cured by further instruction, such instruction should have been requested. If it was a matter that was beyond cure by additional instruction, the plaintiff should have requested the withdrawal of a juror. A mistrial, however, was not sought. This is of particular significance here because the matter objected to first occurred during the opening statement to the jury. A mistrial then would have been relatively harmless. Nor was a motion for mistrial made when on the next day the same matter was raised by the question put to plaintiff by defendant's counsel. Finally, it was the plaintiff himself who brought the question again to the attention of the jury by seeking to justify on this ground the effort to show how long the plaintiff had successfully been in business. At this point plaintiff's counsel appeared to rest content. Perhaps it was felt, since there was no evidence whatever on the subject, that the unanswered question by defendant's counsel had been matched by the unanswered question by plaintiff's counsel. At any rate, in this state of equality in the irrelevant both sides said no more.

(2) In the course of his opening to the jury defendant's counsel referred to a statement made to the Pennsylvania Insurance Commissioner by the plaintiff that the policies in suit were "replacement" insurance and was about to refer to a later deposition, apparently at variance with the statement, when objection was made and sustained. I stated that any contradictions dealing with credibility were matters for trial and not for an opening statement. (Transcript, pp. 15–16). In the colloquy that followed defendant's counsel said: "MR. WHITE: Your Honor, this is not a question of credibility. This is the defense in my case. He has perjured himself on the stand." (Transcript, p. 16). Thereupon plaintiff moved that the statement be stricken as improper and charged defendant's counsel with knowing it to be improper. I instructed the jury to disregard completely the statements of both counsel. (Transcript, pp. 16–17). Here too there was no request by plaintiff for any additional caution to the jury, or for the withdrawal of a juror, or any later request for charge.

The defense of false swearing later foundered on the plaintiff's careful explanation from the witness stand (see Transcript, pp. 142–50), and defendant ultimately abandoned it.[5]

The references to a prior fire and to perjury were improper, but I cautioned the jury to disregard them and reiterated on other occasions that statements of counsel were not evidence and should be disregarded. (See Transcript, pp. 19; 34; 120; 130–31; 384, Charge of the Court). Plaintiff did not request a mistrial but went forward in the submission of the case to the jury. Although he filed requests and supplemental requests for charge, he made no request for any additional cautionary instruction. In matters such as this each case is unique. I think this case is one in which the principle is rightly applicable that one who elects to take his chances on a verdict should not be permitted to complain. See McGuinn v. United States, 89 U.S.App.D.C. 197, 191 F.2d 477, 479 (D.C.Cir. 1951).

It is, of course, true that prejudice may in some circumstances find such deep lodgement in the minds of the jury that it is impossible to eradicate it by any form of admonition. In such event a fair trial becomes impossible and the court on its own motion should require a new trial, notwithstanding the failure of the injured party to have demanded a mistrial. Undoubtedly counsel on both sides in this case made their contentions with much warmth and at times with heated indignation. I am satisfied, however, on a review of the evidence and from the atmosphere of the trial—which cannot be captured in the typewritten transcript—that the plaintiff received a

5. See the discussion on the requests for charge, Transcript, pp. 296–97; and see also pp. 300–01.

fair decision by the jury based on the evidence, and that there is no substantial reason for a retrial.

### ORDER

And now, June 5, 1964, plaintiff's motion for new trial is denied.